UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

IN RE )
) Bankruptcy Case
JAMES L. BENNETT, ) No. 12-60642-tmr7
)
) MEMORANDUM OPINION
Debtor. )

**Procedural History:**

This matter came before the Court on Trustee Joseph M. Charter's objections to certain exemptions claimed by Debtor James L. Bennett. After several pretrial conferences at which the parties resolved certain objections and clarified others, the Court held an evidentiary hearing on April 23, 2013. After the hearing, the matter was taken under advisement. The Court has reviewed the exhibits and testimony, as well as the memoranda and other submissions presented by the parties. At the parties' request, the Court has taken judicial notice of pleadings filed in this case and in the Chapter 11 case of Brookside Inn, Inc. (**Brookside**), District of Oregon Case No. 12-60533-fra11.

**Procedural History:**

Debtor filed this Chapter 7 case on February 24, 2012. After several amendments, he listed in Amended Schedule B and claimed exempt on Amended Schedule C, the following relevant assets:[1]

---

[1] Debtor also claimed that certain fees allegedly due from Frontgate LLC and certain tools were exempt. Trustee objected to the exemption claims. In later proceedings, Debtor withdrew his claim of
(continued...)

MEMORANDUM OPINION-1

> "Retirement/Pension account[,] holder of interest in Brookside Inn LLC[,]" value "unknown," exempting 100% of same under ORS 18.358; and
>
> "Brookside Inn, Inc., 2030 Leigh Way[,] White City, OR 97403 in Chapter 11[,] ownership through Pension Trust Account," value "unknown," exempting 100% of same under ORS 18.358;

Trustee timely objected to the listed exemptions, and Debtor requested a hearing. Although Debtor further amended his schedules, the Court treated Trustee's objections as relating to the most current exemptions claimed. Trustee's specific objection was as follows:

> "Debtor's interest in Brookside Inn, Inc., or Brookside Inn LLC was not included in the James L. Bennett Money Purchase Pension Plan [and] Trust (**Plan 2**)."

At the final pretrial conference held on April 4, 2013, the Court set April 16, 2013, as the deadline for the parties to file witness and exhibit lists along with supporting memoranda. Trustee timely filed a list of exhibits and a supporting brief. On April 22, 2013, six days late and only one day before the hearing, Debtor filed a list of witnesses and exhibits. At the hearing, Debtor filed a tardy hearing memorandum raising four new defenses. The Court indicated it would consider whether the new defenses could be raised at that late date and whether it would give Trustee time to respond. Debtor did present evidence and arguments on the new defenses. Because they do not change the ruling herein, the Court will address the new defenses in this opinion.

**Facts**:

Debtor used David Beaudry as his retirement planner. Apparently, Beaudry prepared form pension plans which his clients would later adopt. In 1995, Debtor adopted the James L. Bennett Pension Plan (**Plan 1**). This was a defined <u>benefit</u> plan and, at least as to its form, qualified for favorable tax treatment under 26 U.S.C. § 401(a).[2] Debtor was trustee, employer, and sole participant/beneficiary thereunder.

---

[1](...continued)
exemption in the fees and Trustee withdrew his objection to the claim of exemption in the tools.

[2] Unless otherwise noted, all subsequent statutory references are to Title 26 of the United States
(continued...)

MEMORANDUM OPINION-2

Debtor made cash contributions into Plan 1. No evidence was submitted regarding the source of the contributions or whether they were tax qualified. From those contributions, on September 2, 1998, Plan 1 purchased 8.22 acres on Leigh Way in White City, Oregon, for $375,000 from White City Steel and Supply.[3] Debtor wanted eventually to build a hotel on the property. In furtherance thereof, in early 1999, he and Timothy Baker (**Baker**) formed Brookside. Brookside's corporate resolution in February 1999 indicated the shares therein would be issued to Debtor personally. Apparently, however, 500 shares of restricted stock were issued to Plan 1 instead[4] with an additional 500 shares issued to Baker. Baker is Brookside's president and Debtor its secretary/treasurer.

In January 1999 Plan 1 sold a 25% interest in the 8.22 acres to the Timothy E. Baker Trust for $100,000.[5] At some point, Plan 1 sold to Baker individually a 50% interest in 1.74 (of the 8.22) acres where the hotel would eventually sit, in exchange for Baker's equity in two 4-plexes in Medford, Oregon. In June 1999 Debtor personally (as opposed to on behalf of Plan 1) executed a shareholder agreement with regard to Brookside. On September 24, 1999, Plan 1 sold David and Marilyn Alex a 25% interest in 6.5 of the 8.22 acres for $75,000.

In 2000 it appears Plan 1 was terminated and the assets therein rolled into Plan 2, including the 500 shares in Brookside. Plan 2 was a defined <u>contribution</u> plan. Again, at least as to its form, it qualified for favorable tax treatment under § 401(a). Debtor remained the trustee, employer, and sole

---

[2](...continued)
Code.

[3] Per Brookside's Second Amended Disclosure Statement dated February 8, 2013, p. 4, Plan <u>2</u> purchased the 8.22 acres, and, then, "Mr. Bennett subdivided" the parcel in 2000. This was impossible, because, also per the Disclosure Statement, p. 16, Plan 2 did not exist until 2000. The Court therefore assumes Plan 1 was the purchaser.

[4] Per Brookside's Amended Disclosure Statement, p. 6, Plan 2 received the shares; again, impossible because Plan 2 did not then exist.

[5] Per Brookside's Amended Disclosure Statement, p. 5, Plan 2 sold the interest; again, impossible.

MEMORANDUM OPINION-3

beneficiary/participant. No copy of either Plan 1 or Plan 2's base document was offered into evidence, although as noted below, several amendments to Plan 2 were adduced.

In 2000 the 8.22 acre plot was subdivided into four tax lots, identified as lots 900-903. Lot 902 was the 1.74 acre hotel parcel. Shortly thereafter, the Baker Trust conveyed its 25% interest in lots 900 and 901 to David and Marilyn Alex. On November 8, 2000, Plan 2 sold David Alex a 25% interest in lot 901 for $75,000.

In September 2002 Plan 2 was amended. Plan 2's Internal Revenue Service (**IRS**) 2002 Form 5500-EZ[6] listed $1,497,710 in real estate (other than employer real property). The balance sheet listed 50% of the 1.74 acres, 75% of a .5 acre parcel, and 50% of a 5.98 acre parcel.

At some point, it appears both Plan 2 and Baker (and possibly the Baker Trust) transferred their interests in the 1.74 acres to Brookside. The consideration for the transfer is unclear and no details were provided by the parties.

Plan 2's 2003 5500-EZ listed $1,818,750 in "partnership/joint venture interests" and no real estate. No balance sheet was adduced into evidence. Its 2004 Form 5500-EZ listed $1,800,000 in "partnership/joint venture interests" and no real estate. The balance sheet simply indicated the plan owned $1,828,750 in assets. Its 2005 Form 5500-EZ listed $1,800,000 in "partnership/joint venture interests" and no real estate. No balance sheet was adduced into evidence.

In May 2006 Plan 2 was amended to provide that, effective January 1, 2006, "the Employer shall make contributions to the Employer Account of each participant who is an Employee on the last day of the Plan Year . . . which contribution . . . shall be an amount equal to 0.0% of the Compensation of each Participant." Plan 2's 2006 Form 5500-EZ listed $1,125,000 in "partnership/joint venture interests" and $850,000 in real estate. The balance sheet listed 75% of 4.98 acres on Leigh Way valued at $1,125,000, 100% of one acre on Leigh Way valued at $350,000, and a 4-plex on Poplar Drive valued at $500,000.

---

[6] Retirement plans with only one participant, such as Plan 2, are required to annually file Form 5500-EZ indicating the assets in and contributions to the plan for that tax year.

MEMORANDUM OPINION-4

In 2007 Plan 2 transferred its remaining 75% share in lot 900 to David Alex. Also in 2007 Brookside obtained a construction loan from Stearns National Bank and gave back a note and trust deed on the 1.74 acres. Thus, it appears the 1.74 acres was transferred to Brookside at some point before the loan. In September 2007 Plan 2 transferred tax lot 903 (the one acre parcel) to Debtor personally for no consideration. It is unclear whether this was a plan "distribution." Plan 2's 2007 Form 5500-EZ listed $900,000 in "partnership/joint venture interests" and $710,000 in real estate. The balance sheet listed 75% of 4.98 acres on Leigh Way valued at $900,000, 100% of one acre on Leigh Way valued at $260,000 (even though the one acre parcel had been transferred to Debtor personally), and the 4-plex on Poplar Drive, valued at $450,000.

In May 2008 the hotel opened and Brookside needed to find a permanent lender. It applied to Rogue Federal Credit Union (**RFCU**) for a takeout loan. In furtherance of that process, RFCU asked for Debtor's and Baker's personal guarantees. It also asked that experienced hotel managers be brought on board. In furtherance of that request, in June 2008 Plan 2 and Baker transferred a total of 100 shares to Philip and Peggy Crapo (10% ownership), whereupon Baker and Debtor personally were each issued 450 shares (45% ownership each). In September 2008 Brookside elected Subchapter S corporation tax treatment. Debtor signed the election form as owning 450 shares personally as of September 22, 2008. A $3.5 million RFCU loan to Brookside closed on October 29, 2008. Baker and Debtor both personally guaranteed it. Three days later (November 1, 2008), Debtor's personal 450 shares were re-issued to Plan 2. On Plan 2's December 31, 2008, balance sheet, Debtor listed a 75% interest in the 4.97 acres, and a full interest in the one acre parcel and the 4-plex on Poplar Drive.

In December 2009 Plan 2 was again amended. On Plan 2's December 31, 2009, balance sheet, Debtor listed a 75% interest in 4.97 acres on Leigh Way, and a full interest in the one acre parcel and the 4-plex on Poplar Drive.

In February 2010 Debtor listed himself as the owner of 500 shares of Brookside on a financial statement provided to South Valley Bank and Trust. He also listed the one acre lot and the 4-plex as owned by him personally and the 4.98 acre lot as owned by him and Alex. In March 2010 Plan 2 was amended to

MEMORANDUM OPINION-5

modify its anti-alienation clause, evidently to exclude Plan loans from its prohibitions. At some point in 2010 Lot 901 was conveyed to Alex Enterprises, LLC (**LLC**), of which Debtor owns 25% and David Alex owns 75%. Plan 2's December 31, 2010, balance sheet listed a 75% interest in the 4.97 acres, and a full interest in the one acre parcel and the 4-plex. IRS Form K-1 issued by Brookside for 2010 indicated Debtor personally held a 45% share in Brookside.

In January 2011 Debtor listed himself as the owner of 500 shares in Brookside on a financial statement given to South Valley Bank and Trust. He also listed the one acre lot and the 4-plex as owned by him personally and the 4.98 acre lot as being owned by him and Alex.

Plan 2's 2011 Form 5500-EZ listed $3,505,000 in total plan assets. (The form itself no longer required itemization in specific asset categories). It indicated no contributions were made that year. The balance sheet listed 75% of the 4.98 acres valued at $450,000, 100% of the one acre parcel valued at $125,000, and the 4-plex valued at $330,000. New to the balance sheet was a 45% interest in the 1.74 acres valued at $2,925,000.

Brookside filed Chapter 11 on February 17, 2012. Baker signed the schedules and statement of financial affairs (**SOFA**) as President. Schedule A listed the 1.74 acres as owned by Brookside in fee. Schedule D listed RFCU as being secured on the 1.74 acres and being owed $3.39 million. Schedule H listed Debtor and Baker as codebtors on the RFCU debt. SOFA #21 listed Bennett personally as holder of 450 shares in Brookside.

One week after Brookside's filing, Debtor filed this Chapter 7 case. The 1.74 acres was not listed on Schedule A. Debtor listed the 4-plex and one acre parcel as being owned personally. He listed shares in Brookside with an unknown value. SOFA #18 did not list Brookside.

On May 24, 2012, Debtor signed a statement to the Oregon Liquor Control Commission that he personally owned 450 shares in Brookside.

On August 14, 2012, Debtor amended his Schedule B to list the Brookside stock as owned by a "pension trust account." He also added "retirement/pension account" to Schedule B. He listed the values of both the account and stock as "unknown." He exempted the full value of same by indicating 100% on

MEMORANDUM OPINION-6

Schedule C, with the exemption claimed under ORS 18.358. Trustee timely objected. On September 27, 2012, Debtor amended Schedules B and C to name Plan 2 specifically, instead of generically. The amendments did not resolve Trustee's objections which then applied to the amended exemptions.

Brookside's Second Amended Plan listed Plan 2 and Baker as Brookside's equity interest holders. On March 22, 2013, the confirmation hearing on Brookside's Second Amended Plan was held. Trustee had objected because the Brookside Plan improperly failed to provide for payment on a loan made by Debtor to Brookside. That objection, along with another by Brookside's former franchisor (La Quinta), were settled. Following court approval of the settlements, the Brookside court entered a confirmation order on May 14, 2013.

**Issues:**

At the pretrial conference held February 19, 2013, the parties narrowed the disputed exemption issues to: 1) whether Plan 2 was an Internal Revenue Code (**I.R.C.**) qualified account so as to fit within the Oregon retirement plan exemption; and 2) whether the Brookside stock was properly transferred into Plan 2. Issue #2 presumes Plan 2 owned the stock when Debtor filed his Chapter 7 petition. The issue of ownership however was contested by Trustee, and briefed and argued by the parties. The Court will address that issue first.

**Discussion:**

Stock Ownership:

Trustee argues Debtor personally owned the 450 shares in Brookside as of his Chapter 7 filing. Debtor argues Plan 2 owned it. Trustee references all of the instances set out above where Debtor expressly declared himself the owner. Debtor testified that those references were inadvertent errors, and that in fact he only owned the shares personally for the four months or so in 2008 when the RFCU loan was being processed. He further argued for the first time at hearing that Trustee was bound by preclusion principles, in that ownership had already been established in Plan 2's favor by virtue of Brookside's confirmed plan. The Court need not address the preclusion argument, because in any event it finds, based on the evidence before it, that Plan 2 owned the stock as of Debtor's Chapter 7 petition.

MEMORANDUM OPINION-7

The Court acknowledges the evidence of ownership is in conflict, with Debtor making multiple representations to third parties that he owned the stock, and Brookside's 2009 Form K-1 indicating the same. The Form 5500-EZ's and the balance sheets attendant thereto, when read as a set, provide little indication one way or another. None of them after 2008 list the stock per se, although one could read the 2011 notation of 45% ownership interest in the 1.74 acre parcel as being Debtor's errant attempt to disclose Plan 2's interest in Brookside.[7]

The Court finds the most persuasive evidence of stock ownership to be the stock certificate itself, which indicates that on November 1, 2008, after the RFCU loan closed, the 450 shares were transferred from Debtor to Plan 2. See Yeoman v. Pub. Safety Ctr., Inc., 241 Or. App. 255, 263, 250 P.3d 411, 415 (2011) (stock certificate is evidence but not conclusive evidence of share ownership). The Court finds such stock ownership in Plan 2 consistent with Debtor's overall plan, dating back to the 1990s, that the hotel be the main vehicle for his retirement. Further, there is no direct evidence of the stock's transfer after November 1, 2008.

Exclusion/Oregon Exemption:

The filing of a petition creates an estate that contains "all legal or equitable interests of the debtor in property as of the commencement of the case" "wherever located and by whomever held . . . ." 11 U.S.C. § 541(a)(1). Despite this broad language, Debtor argued for the first time at hearing that Plan 2 should be excluded from the estate. Under 11 U.S.C. § 541(c)(2), "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under . . . title [11]." Thus, assets in valid spendthrift trusts under state law are excluded from bankruptcy estates. Patterson v. Shumate, 504 U.S. 753, 762, 112 S. Ct. 2242, 2248 (1992).[8] Alternatively, even if initially

---

[7] Despite its 2011 balance sheet, and contrary to Trustee's argument, the Court does not find the 1.74 acre parcel on which the hotel sits was transferred to Plan 2 in 2011. Trustee does not contest that Brookside owned the parcel as of its Chapter 11 petition in early 2012. He has adduced no 2011 deed transferring the property into Plan 2 nor a deed pre-dating Brookside's filing transferring it back out.

[8] Patterson also held that "applicable nonbankruptcy law" was not limited to state law, but also
(continued...)

MEMORANDUM OPINION-8

included, Debtor argues his interest in Plan 2 is exempt.[9] Debtor relies on ORS 18.358 for both his "exclusion" and "exemption" arguments. With certain limitations not germane to the present discussion, ORS 18.358(2) provides:

> a <u>retirement plan</u> shall be conclusively presumed to be a valid spendthrift trust under these statutes and the common law of this state, whether or not the retirement plan is self-settled, and a beneficiary's interest in a retirement plan shall be exempt, effective without necessity of claim thereof, from execution and all other process, mesne or final. (emphasis added).

"Retirement plan" is defined in relevant part as:

> (A) A pension plan and trust, including a profit sharing plan, that is described in section[ ] 401(a) . . . of the Internal Revenue Code,[10] including that portion attributable to contributions made by or attributable to a beneficiary;
>
> (C) Any pension not described in subparagraphs (A) and (B) of this paragraph granted to any person in recognition or by reason of a period of employment by or service for . . . any . . . person . . . .

ORS 18.358(1)(d)(A), (C).

---

[8](...continued)
applied to federal law, and in particular the Employee Retirement Income Security Act (**ERISA**). ERISA plans by necessity include anti-alienation clauses. Id. at 759-760, 112 S. Ct. at 2247-2248. Here, the parties concede, and the Court agrees, that Plan 2 is not ERISA-qualified because the employer and the only employee thereunder are the same person. Watson v. Proctor (In re Watson), 161 F.3d 593, 594 (9th Cir. 1998).

[9] In some federal jurisdictions, debtors are given a choice between the exemptions allowed under 11 U.S.C. § 522(d) and those allowed under state law. 11 U.S.C. § 522(b)(1). However, states may opt-out of the § 522(d) exemptions, 11 U.S.C. § 522(b)(2), although other federal exemptions may be claimed. 11 U.S.C. § 522(b)(3)(A). When this case was filed, Oregon had opted out, ORS 18.300 (2011). Of interest, Oregon recently opted back in and now allows debtors to choose between the Oregon and § 522(d) exemptions, ORS 18.300(1)-(2) (2013), for cases filed on or after July 1, 2013. 2013 Or. Laws ch. 597, §§ 5-6. The recently amended statute does not apply in the case at bar.

[10] "'Internal Revenue Code' means the federal Internal Revenue Code as amended and in effect on December 31, 1998." ORS 18.358(1)(b).

MEMORANDUM OPINION-9

Thus, under the Oregon statute, if Plan 2 is a "retirement plan" it is both excluded from the estate as a spendthrift trust, and, perhaps paradoxically, Debtor's beneficial interest therein is first included in, but then exempted from, the estate.[11]

Debtor argues Plan 2 falls under ORS 18.358(1)(d)(A). Under subsection A, Plan 2 must be "[a] pension plan and trust . . . that is described in section[ ] 401(a) . . . of the Internal Revenue Code." Plan 2 is a "money purchase pension plan." Such plans are considered "pension" plans described in § 401(a). 26 C.F.R. § 1.401-1(b)(1)(i).[12] Plan 2 in its entirety has not been introduced into evidence. The Court has only

---

[11] A claimed exemption is "presumptively valid." *Tyner v. Nicholson (In re Nicholson),* 435 B.R. 622, 630 (9th Cir. BAP 2010)(citing *Carter v. Anderson (In re Carter),* 182 F.3d 1027, 1029 n. 3 (9th Cir.1999)). "If a party in interest timely objects, 'the objecting party has the burden of proving that the exemptions are not properly claimed.' " *Nicholson,* 435 B.R. at 630 (quoting Rule 4003(c)). Initially, this means that the objecting party has the burden of production and the burden of persuasion. *Carter,* 182 F.3d at 1029 n. 3. The objecting party must produce evidence to rebut the presumptively valid exemption. *Id*. Once rebutted, the burden of production then shifts to the debtor to come forward with unequivocal evidence that the exemption is proper. *Id*. The burden of persuasion, however, always remains with the objecting party. *Id.*

D.A.N. Joint Venture III L.P. v. Richey (In re Richey), 2011 WL 4485900, *9 (9th Cir. BAP 2011). Thus one begins with the assumption Plan 2 is exempt, which in the present context means compliant with the asserted I.R.C. provisions incorporated into ORS 18.358. Thus, it is Trustee's burden, subject to the shifting burdens noted above, to prove noncompliance (or disqualification).

[12] Only the employer contributes to a money purchase plan. More specifically:

> In a money purchase pension plan, the employer is obligated to make definite payments, not contingent on profits or otherwise. The amount of contribution, however, is not computed with respect to a determinable benefit for each employee. The contributions are usually a fixed percentage of employee compensation, but could be a fixed total amount or even a fixed amount for each employee. The IRS has approved an employer contribution that is a fixed proportion of employee contributions. The amount of benefit an employee will receive on retirement is whatever can be provided by the total contributions on his behalf (and the earnings thereon) up to that time. Put

(continued...)

MEMORANDUM OPINION-10

been able to review certain of its amendments. It will presume Plan 2 was originally § 401(a) compliant, at least as to form. See n.11 supra. Trustee, however, seeks to disqualify it from § 401(a) status and thus negate its spendthrift trust and exempt status.

In general, if an employer who is also the fiduciary and sole plan participant "abuses" plan assets, the plan may be disqualified from § 401(a) status. Plunk v. Yaquinto (In re Plunk), 481 F.3d 302, 306-307 (5th Cir. 2007). It further appears the majority view is that a bankruptcy court, when determining the validity of an exemption, has the power to disqualify a retirement plan from favorable tax status (and thus deny the exemption) if such abuse is present, especially if the IRS has not previously made any determination on the merits of the alleged abuse. Id. at 307 (Texas exemption); Daniels v. Agin, 482 B.R. 1, 9-10 (D. Mass. 2012) (federal exemption); Richey, 2011 WL 4485900 at *12 (Arizona exemption). Here, at most, there is testimony and notations on the Forms 5500-EZ that Beaudry's prototypes (and not Plan 2 specifically) met § 401(a)'s requirements as to form. There is no evidence the IRS made any subsequent determination on

---

[12](...continued)
> another way, the benefit is whatever can be purchased by the money allocated to the employee, hence the name, money purchase plan. The amounts contributed must be allocated among the participants according to a definite formula, and an account showing the balances allocated must be kept for each participant. The absence of a defined benefit means that the plan does not use an actuary. Investment experience, therefore, directly affects the amount of benefit the employee will receive. Gains and losses do not affect the employer's subsequent contribution. (Assets do have to be valued annually, however.)

1 Qual. Deferred Comp. Plans § 1:9, Boren and Stein (database updated July 2013) (footnotes omitted).

> Although a money purchase pension plan is required to have a fixed contribution, this does not preclude a money purchase pension plan from being drafted to require a zero contribution. This can be helpful where a vehicle in which to park rollover contributions is desired and future contributions are not anticipated. Such could not be done in the context of a profit-sharing plan without running afoul of the substantial and recurring contribution requirement applicable to profit-sharing plans.

Qualified Pension & Profit Sharing Plans, § 1.05, Perdue (Thomsen/RIA 2012) (footnote omitted).

MEMORANDUM OPINION-11

Plan 2's continuing qualification after the abuses alleged by Trustee. As such, the Court is free to make its own determination.

"Abuse" rising to disqualification often is a pattern rather than a one-time breach. The abuses or breaches can come in different forms. They can come from simply not following the plan's dictates as to contributions and distributions. For self-employed individuals whose plans only cover themselves, they can also come from transactions that are prohibited by the I.R.C. Those prohibitions are listed in § 4975.[13]

Under § 4975(c)(1), a prohibited transaction involves any direct or indirect–

> (A) sale or exchange, or leasing, of any property between a plan[14] and a disqualified person;[15]
>
> (B) lending of money or other extension of credit between a plan and a disqualified person;
>
> (C) furnishing of goods, services, or facilities between a plan and a disqualified person;
>
> (D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;
>
> (E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or
>
> (F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

---

[13] In and of itself, a prohibited transaction leads to excise tax liability for the transgressor. § 4975(a)-(b). However, it is also factored into whether a plan should be disqualified.

[14] "Plan" means among other things "a trust described in § 401(a) which forms a part of a plan." § 4975(e)(1).

[15] As applicable here, "disqualified person" includes a(n): 1) fiduciary; 2) employer any of whose employees are covered by the plan; and, 3) corporation where the owner of 50% or more of the stock is a fiduciary or employer. § 4975(e)(2)(A), (C), (G). "Fiduciary" in turn is defined in relevant part as any person "who exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or has any discretionary authority or discretionary responsibility in the administration of such plan." § 4975(e)(3)(A), (C).

MEMORANDUM OPINION-12

Because Debtor was the plan's fiduciary and employer, he was a disqualified person. Further, when Debtor owned 50% of Brookside's shares, Brookside was a disqualified person. Thus, it appears Plan 2's transfer of its share of the 1.74 acres to Brookside was prohibited. § 4975(c)(1)(A). Further, Plan 2's transfer of the 500 shares in June 2008 to allow re-issuance of 450 shares to Debtor personally to help Brookside's qualification for the RFCU loan was prohibited because it was a transfer to Debtor of plan assets, § 4975(c)(1)(D), and also because it was an act by Debtor which dealt with Plan 2's assets in his own interest or for his own account. § 4975(c)(1)(E).[16]

Aside from or in addition to § 4975 "prohibited transactions," operational errors or breaches of the plan itself can justify disqualification. As noted above, because Plan 2 is a money purchase plan, only the employer is eligible to make contributions. However, the 2006 plan amendment prohibited employer contributions. Thus the transfer of the 450 shares back to Plan 2 in November 2008 was a breach of Plan 2's provisions. Even if employer contributions were permitted, because Debtor was an "owner-employee," § 401(c)(3)(A), there were certain limits on contributions, § 401(a)(10); those being, the contributions must be made only with respect to Debtor's earned income derived from the trade or business with respect to which Plan 2 was established. § 401(d). Here, the 450 shares transferred back to Plan 2 were not with respect to Debtor's earned income in 2008. See § 401(c)(2) (defining earned income). Rather, they were merely former plan assets being transferred back into the plan. The Court does not view the transfer back into the plan as simply rectifying a mistaken prohibited transaction, but rather as further conduct where plan formalities were disregarded in furtherance of Debtor's interests.

Because the above transactions display a pattern of prohibited transactions as well as operational breaches, Plan 2 must be disqualified. Therefore it is not a plan "described in section[ ] 401(a)" for purposes of ORS 18.358(1)(d)(A).

---

[16] There are certain transactions listed in § 4975(d), which are exempt from the prohibitions of § 4975(c). Amongst these are receipt of benefits to which the disqualified person may be entitled as a plan participant or beneficiary, § 4975(d)(9), and plan distributions that conform to § 4044 of title IV of ERISA. § 4975(d)(12). Debtor here has not argued that any of the § 4975(d) exemptions apply, and in fact no Form 1099 was adduced indicating a plan distribution was made.

Alternatively, Debtor argues Plan 2 is "any pension not described in subparagraph[ ] (A) . . . granted to any person in recognition or by reason of a period of employment by or service for . . . any . . . person." ORS 18.358(1)(d)(C). Construing the predecessor statute, ORS 23.170, which contained nearly identical language, courts held that to come within the statute: 1) "the person granting the trust must be different than the person granted the trust;" and 2) "the debtor may not exercise such control over the assets of the pension as to make it more like a conventional savings account and less like a true retirement fund." Hebert v. Fliegel, 813 F.2d 999, 1001 (9th Cir. 1987) (internal quotation omitted); Bishop v. Masters (In re Masters), 73 B.R. 796, 797 (Bankr. D. Or. 1987) (same). Under that authority, Plan 2 would not withstand the first prong, as Debtor was both the employer/settlor and employee/beneficiary/participant. The statute, however, was amended in 1989 to its present form which deems a "retirement plan" both a spendthrift trust and exempt "whether or not . . . self-settled." ORS 23.170(2) (1989); ORS 18.358(2). This language appears to eliminate prong one's "separateness" requirement, although the Court was unable to find any controlling authority on this point. In any event, it did not eliminate prong two which prohibits excessive control by the debtor.

Although the base plan documents have not been adduced, the evidence nevertheless indicates Debtor exercised complete control over Plan 2's assets. In doing so, he basically treated it like a savings account. Hebert, 813 F.2d at 1001. Indeed it would be hard to reconcile the disqualification of a plan from § 401(a) treatment based on prohibited transactions and operational failures, yet still find it met ORS 18.358(1)(d)(C)'s standard.

**Federal Exemption**:

Debtor argued for the first time at hearing that Plan 2 is exempt under 11 U.S.C. § 522(b)(3)(C), which in relevant part allows a debtor to exempt "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401 . . . of the Internal Revenue Code of 1986." The statute goes on to create a presumption of valid exemption if the retirement fund has received a favorable determination under § 7805 of the I.R.C. and that determination is in effect as of the bankruptcy petition's filing. 11 U.S.C. § 522(b)(4)(A). If no such favorable determination has been received, the funds are

MEMORANDUM OPINION-14

exempt if the debtor demonstrates no prior adverse determination by a court or the IRS and the retirement fund is in substantial compliance with the applicable requirement of the I.R.C., or, if the fund is not in substantial compliance, the debtor is not materially responsible for such failure. 11 U.S.C. § 522(b)(4)(B).

This federal exemption supplements the exemptions an opt-out state debtor may take. Mullen v. Hamlin (In re Hamlin), 465 B.R. 863, 870 (9th Cir. BAP 2012). To obtain the presumption, there must be evidence of a favorable determination letter. There is no binding authority as to whether that means a letter with regard to the abuses alleged, or simply a letter issued at any point in the plan's existence. Some courts have applied the presumption if any determination letter is in place. See e.g., Willis v Menotte, 2010 WL 1408343 at *5 (S.D. Fla. 2010). However, even these courts hold the presumption is rebuttable. Id.; see also In re James, 489 B.R. 731, 739 (Bankr. E.D. Tenn. 2013). Here, even assuming such a presumption exists, based upon the above-described prohibited transactions and operational failures disqualifying the plan, Trustee has rebutted it. Plan 2 is thus no longer exempt from taxation under § 401(a), and the funds therein are not exempt under 11 U.S.C. § 522(b)(3)(C).

**Conclusion**:

Plan 2 owned the 450 shares in Brookside as of the petition date. Plan 2 however is neither excluded from the estate nor is Debtor's beneficial interest therein exempt. Trustee's objection is sustained. He shall prepare a separate order consistent with this opinion and tender it within 10 days. This memorandum opinion shall constitute the Court's findings of fact and conclusions of law pursuant to FRBP 7052.

THOMAS M. RENN
Bankruptcy Judge

MEMORANDUM OPINION-15

Case 12-60642-tmr7    Doc 155    Filed 09/03/13